*In re* MARRIAGE OF NORMA GLEE FRASCO, Petitioner-Appellee, and R. ROBERT FRASCO, Respondent-Appellant.

Fourth District    No. 4—93—0249

Argued November 16, 1993.—Opinion filed February 14, 1994.—Supplemental opinion filed on denial of rehearing August 29, 1994.

172

Wayne R. Golomb (argued), of Springfield, for appellant.

David K. Harris (argued), of Springfield, for appellee.

JUSTICE COOK delivered the opinion of the court:

Respondent R. Robert Frasco appeals the denial of his petition for termination of maintenance in which he alleged that his former wife, Norma Scott, was cohabiting with a man on a resident, continuing conjugal basis. He also appeals the court's award of attorney fees to petitioner.

In January 1987 petitioner filed a petition for dissolution of marriage. At the same time, she left the marital home and moved into the home of her sister and brother-in-law (the Averse residence), where she was to help care for her sister's elderly mother-in-law. She was then receiving temporary maintenance of $600 per month from respondent and was working part-time at Sears. In February 1990, shortly after the death of her sister's mother-in-law, petitioner's adult daughter, who had become permanently disabled as the result of a car accident, came to live with petitioner at the Averse residence.

A judgment of dissolution of marriage was entered in August 1990 in which petitioner was awarded $49,000 in marital property; maintenance of $2,000 per month until May 1991, and $1,500 per month thereafter; and her attorney fees of $5,695.40. Respondent filed an appeal with this court which affirmed the judgment. *In re Marriage of Frasco* (1991), 211 Ill. App. 3d 1113 (unpublished order under Supreme Court Rule 23), *appeal denied* (1991), 141 Ill. 2d 539.

On November 26, 1991, respondent filed a petition for modification of maintenance alleging a substantial change in circumstances since entry of the judgment of dissolution. At approximately the same time, petitioner filed a petition for judgment on the property and attorney fees awarded her, as well as a petition for rule to show cause for failure to comply with the judgment of dissolution. A judgment and order for rule to show cause were entered on or about December 27, 1991.

On February 13, 1992, respondent filed a motion to stay payment of maintenance alleging petitioner was cohabiting with a man on a resident, continuing conjugal basis. The court denied the motion but respondent nevertheless ceased maintenance payments to petitioner after April 1992. Through the time of the court's ruling on respondent's post-trial motions on March 8, 1993, respondent had still not satisfied the property award judgment.

At the hearing on the petition to terminate maintenance, petitioner testified that until June 1991, she and her disabled daughter Jamie had lived with her sister and brother-in-law in the Averse residence. In May 1991, Roy (Bud) Longanecker, whom petitioner had met at her niece's wedding the year before, invited her and her daughter to move into his home at 25 Drawbridge. Petitioner knew the Averses planned to sell their home and move to a condominium, which they purchased on June 5, 1991, so she accepted Longanecker's offer. Petitioner and Longanecker opened a joint checking account called "25 Drawbridge Associates" in which each was to deposit an equal share of the household expenses. Longanecker initially contributed more money than did petitioner as he made improvements to the house to accommodate petitioner's daughter. From June until November 1991, petitioner deposited $6,000 in the Drawbridge account while Longanecker deposited $14,000, $11,000 of which was used for remodeling costs. Petitioner and Longanecker each maintained individual checking accounts to pay for personal expenses. Petitioner paid the personal expenses for herself and her daughter, who had no assets and no income. Petitioner temporarily added Longanecker's name to a $17,000 certificate of deposit (CD), which she had received as a settlement from the dissolution of her first marriage, in order to enable Longanecker to care for Jamie in the event something happened to petitioner.

While the parties resided together, Longanecker and petitioner had separate bedrooms and they had no sexual relations. Both petitioner and Longanecker shared the household responsibilities; she took care of the house and did the laundry, and he cooked meals because he liked to do so. They took turns grocery shopping and

shared the yard work. Petitioner testified that after respondent ceased making maintenance payments in May 1992, her only source of income was $288 in monthly social security benefits, which was increased to $643 in August 1992. Her part-time position with Sears had been terminated in February 1991. By the time of the hearing in November 1992, petitioner stated that she had only $5,000 remaining in her CD as she was required to expend the remaining funds to support herself and her daughter. She testified that her monthly expenses at the Drawbridge residence with Longanecker were $1,695 a month, which was more than what they had been at the Averse residence, but that some of those expenses doubled when Longanecker moved out because she then had to pay the entire mortgage and utility bills. At the time of the hearing, Longanecker was 63 years old and petitioner 64 years old.

Longanecker testified that he was the vice-president and general manager of RC Cola and had purchased the Drawbridge residence in October 1990. The mortgage and utilities are solely in his name. He stated that he was married but his wife had been in a nursing home for $2^1/2$ years as the result of schizophrenia, emphysema, liver problems and Alzheimer's. After meeting petitioner at her niece's wedding in June 1990, he and petitioner became relatively constant companions. They went out to dinner and movies and he held her hand in public, kissed her, and bought her flowers and perfume. Longanecker testified that petitioner had been very insecure about her financial condition because her sister and brother-in-law were selling their home and she needed to find a residence for herself and her daughter. Longanecker invited petitioner to move into the Drawbridge residence in May 1991 and they each agreed to deposit funds in the Drawbridge account to share the household expenses evenly. He asked petitioner to come and live with him because he "wanted a home where he could come home to dinner and a clean house." They shared dinners at home on a regular basis, with Longanecker often preparing the meals because he enjoyed cooking. Petitioner kept the house neat and clean, paid the household bills from the joint account, did the laundry, and took care of the garden. Longanecker mowed the lawn and took care of maintenance around the house.

In March 1992 Longanecker left the Drawbridge residence due to the "legal harassment and constant surveillance of the house." At the time of hearing, petitioner and her daughter remained in the residence and paid Longanecker $725 a month rent and also paid all the utilities. Longanecker continued to do physical work that needed to be done around the residence such as mowing the lawn. He came to the house an average of five days a week, although he had not spent

another night there. He characterized his relationship with the petitioner as "close friends" and he spent the holidays with petitioner and her sister and brother-in-law and their children. Longanecker also testified that he and petitioner took trips to Rockford, to his sister's house in Wisconsin, and a cruise to Alaska sponsored by his employer.

On January 19, 1993, the court issued a letter opinion denying respondent's petition to terminate maintenance, finding petitioner and Longanecker "were not involved in a *de facto* husband/wife relationship." The court found that the relationship between petitioner and Longanecker, while warm and friendly, was "more of an economic relationship commonly entered into by roommates to share living expenses." The court further found that when petitioner moved into the Drawbridge residence she was financially insecure and the cohabitation had not "materially affected the Petitioner's need for support because she has not received support from Mr. Longanecker or used maintenance monies to support [him]." It was the court's opinion that the petitioner's financial hardships "are a direct result of the Respondent's failure to pay monies ordered by the Court for property awards, considerable legal fees incurred because of Respondent's continuous pursuit of litigation of these matters and his termination of maintenance payments without authority of the Court." The court found the current maintenance arrearage to be $13,500, that petitioner had incurred legal fees of $10,433 and that a judgment of $54,695.40 plus judgment interest was outstanding since December 27, 1991. The court found respondent in wilful contempt of court for failure to comply with its orders.

Respondent filed post-trial motions seeking to amend his petition for modification to terminate maintenance retroactive to May 1991 rather than November 1991, the date he filed his petition. He also filed a motion for partial stay of enforcement of judgment as to the arrearage of maintenance, the attorney fees, and an additional sum of $10,500 representing maintenance already paid petitioner from May 1991 until April 1992. The court allowed the post-trial motion to amend and granted a partial stay from the payment of maintenance arrearage, attorney fees, and future maintenance, but ordered the respondent to satisfy the property award judgment within 10 days. This appeal followed.

Respondent claims the evidence indicates petitioner and Longanecker participated in a *de facto* husband and wife relationship by virtue of the nature of their cohabitation—their personal and social relationship, the sharing of the household chores, and the commingling of assets in the joint checking account and the CD.

Section 510(c) of the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1991, ch. 40, par. 510(c)) provides for termination of maintenance under certain circumstances. That statute provides:

> "Unless otherwise agreed by the parties in a written agreement set forth in the judgment or otherwise approved by the court, the obligation to pay future maintenance is terminated upon the death of either party, or the remarriage of the party receiving maintenance, or if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis."

The fact that an ex-wife lives with another man does not automatically justify termination of maintenance but requires a showing of a *de facto* husband and wife relationship. (*In re Marriage of Arvin* (1989), 184 Ill. App. 3d 644, 649, 540 N.E.2d 919, 923.) Each case for termination of maintenance must rest on its own facts, given the unique nature of the personal relationship. (*In re Marriage of Sappington* (1985), 106 Ill. 2d 456, 466, 478 N.E.2d 376, 380.) Proof of sexual conduct between the cohabitants is unnecessary to establish cohabitation on a conjugal basis. (*Sappington*, 106 Ill. 2d at 468, 478 N.E.2d at 381.) A *de facto* husband and wife relationship has been found to exist even though one of the cohabitants is married. *In re Marriage of Roofe* (1984), 122 Ill. App. 3d 56, 60, 460 N.E.2d 784, 786.

Once an ex-spouse paying maintenance has demonstrated that a *de facto* relationship does exist, it is incumbent upon the maintenance recipient to demonstrate the relationship in which he or she is engaged is not the type of relationship which was intended by the legislature to justify the termination of the obligation to pay maintenance. *Sappington*, 106 Ill. 2d at 467, 478 N.E.2d at 381.

●1 In this case, contrary to the conclusion of the trial court, all the facts of record are indicative of a resident, continuing conjugal cohabitation existing between petitioner and Longanecker. The domestic arrangement clearly conforms to the traditional model of marriage—petitioner performed most of the household tasks allotted to the role of homemaker, such as housecleaning, laundry, shopping, and bill paying, while Longanecker took care of general maintenance and yard work. The couple took all of their meals together, as well as trips and vacations. In addition, the cohabitants created a joint checking account in which they commingled funds—petitioner deposited $6,000 of her maintenance payments and initially put Longanecker's name on her CD. Moreover, in contrast to the trial court's characterization of the relationship as that of "roommates," which denotes shared living quarters but not shared lives, the evidence indicates the coresidency supported and enhanced an existing

exclusive dating relationship between petitioner and Longanecker. Although there was no evidence of a sexual liaison, petitioner and Longanecker were "constant companions" since their meeting in June 1990 and remained so even following the period Longanecker moved out of the Drawbridge residence. They were demonstrably affectionate toward one another, exchanged gifts, shared holidays and spent special occasions with petitioner's family. The totality of the evidence evinces a resident, conjugal relationship intended by the legislature to justify the termination of the obligation to pay maintenance. The fact that Longanecker moved from the Drawbridge residence in March 1992 has little bearing on the continuing nature of the relationship. Longanecker testified that he did so solely in response to the instant litigation. As he has continued the close social relationship with petitioner, it is reasonable to presume he will resume coresidency when this litigation is terminated. The evidence establishes that petitioner has entered into a relationship which amounts to that of husband and wife and falls within the provisions of section 510(c) of the Act (Ill. Rev. Stat. 1991, ch. 40, par. 510(c)).

While this court and other districts have expressed the view that one factor to be considered in cohabitation cases is whether the cohabitation has materially affected the recipient spouse's need for support because she receives support from her coresident or has used maintenance funds to support him (see *In re Marriage of Bramson* (1980), 83 Ill. App. 3d 657, 663, 404 N.E.2d 469, 473; *Arvin*, 184 Ill. App. 3d at 649, 540 N.E.2d at 923; *In re Marriage of Caradonna* (1990), 197 Ill. App. 3d 155, 159, 553 N.E.2d 1161, 1164; *In re Marriage of Johnson* (1991), 215 Ill. App. 3d 174, 180, 574 N.E.2d 855, 858; *In re Marriage of Klein* (1992), 231 Ill. App. 3d 901, 906, 596 N.E.2d 1214, 1217; *In re Marriage of Reeder* (1986), 145 Ill. App. 3d 1013, 1021, 495 N.E.2d 1383, 1386), we do not believe that a shown need for support can be controlling and in itself sufficient to defeat a petition to terminate maintenance when all other factors demonstrate an ongoing, conjugal relationship to exist. In none of the cited cases was the existence of a shown need for support the sole determining factor of whether maintenance was to be terminated. See, *e.g.*, *Bramson*, 83 Ill. App. 3d at 662-63, 404 N.E.2d at 473 (coresidency was on a temporary basis); *Arvin*, 184 Ill. App. 3d at 650, 540 N.E.2d at 923 (coresidents did not have a joint checking account or commingle funds); *Caradonna*, 197 Ill. App. 3d at 160, 553 N.E.2d at 1165 (six-month term of the coresidency weighed against a finding of a *de facto* husband and wife relationship, ex-wife paid all her own expenses except rent for approximately six months, and the residents did not commingle funds); *Johnson*, 215 Ill. App. 3d at 181, 574 N.E.2d at 859

(ex-wife had a rented room elsewhere, there was no evidence of shared expenses, and no evidence the coresident paid any of the ex-wife's expenses); *Klein*, 231 Ill. App. 3d at 906, 596 N.E.2d at 1217 (ex-wife conceded issue of cohabitation); see also *In re Marriage of Lambdin* (1993), 245 Ill. App. 3d 797, 804, 613 N.E.2d 1381, 1387 (relationship was short term, the periods of coresidency infrequent and the parties had no joint bank accounts).

We note that an analysis based on need appears nowhere in the statute and would not be an appropriate consideration were termination sought on the basis of petitioner's remarriage or respondent's death. The purpose of section 510(c) is to prevent a spouse from achieving indirectly (by cohabitation on a resident, continuing conjugal basis), what could not be achieved directly (by remarriage). We see no basis for assuming the legislature intended to confer on an ex-spouse engaging in a *de facto* relationship protections and advantages denied to a maintenance recipient who remarries. While a trial court's finding that the recipient spouse is not living in a *de facto* husband and wife relationship will not be reversed unless it is contrary to the manifest weight of the evidence (*Caradonna*, 197 Ill. App. 3d at 159, 553 N.E.2d at 1164), on these facts, we find that the court abused its discretion in denying the petition to terminate maintenance.

Respondent makes the additional claim that it is a denial of equal protection under the Illinois and Federal constitutions to refuse to terminate maintenance because a cohabiting ex-spouse has a continued need for support, while requiring termination for an ex-spouse who remarries having a similar need. However, since respondent has not seen fit to present anything more than a bare assertion, supported by neither argument nor authority, the issue does not merit our consideration on appeal and is deemed waived. See 134 Ill. 2d R. 341(e)(7); *People ex rel. Aldworth v. Dutkanych* (1986), 112 Ill. 2d 505, 493 N.E.2d 1037; *County of Cook v. Renaissance Arcade & Bookstore* (1988), 122 Ill. 2d 123, 145, 522 N.E.2d 73, 82.

Respondent next argues that he is entitled to a credit for maintenance paid as of the date of first cohabitation of petitioner and Longanecker rather than the date he filed his petition. Respondent cites cases providing for termination of maintenance upon the remarriage of the recipient spouse or death of the paying spouse. (See *Lamp v. Lamp* (1979), 73 Ill. App. 3d 713, 392 N.E.2d 349; *Richheimer v. Richheimer* (1972), 9 Ill. App. 3d 376, 292 N.E.2d 190; *In re Marriage of Clarke* (1984), 125 Ill. App. 3d 432, 465 N.E.2d 975; *King v. Hanson* (1989), 192 Ill. App. 3d 966, 549 N.E.2d 757.) We find these cases are not comparable as this case involves neither remarriage nor death.

•2 The law is clear in Illinois that past-due installments of support are a vested right and a court has no authority to modify them. (See *In re Marriage of Hawking* (1992), 240 Ill. App. 3d 419, 425-26, 608 N.E.2d 327, 330-31 (and cases cited therein); see also *In re Marriage of Kessler* (1982), 110 Ill. App. 3d 61, 74, 441 N.E.2d 1221, 1229-30; *Stark v. Stark* (1971), 131 Ill. App. 2d 995, 998, 269 N.E.2d 107, 109; *Gregory v. Gregory* (1964), 52 Ill. App. 2d 262, 266-67, 202 N.E.2d 139, 142 (and cases cited therein).) Moreover, as stated in *Hawking*, section 510(a) of the Act (Ill. Rev. Stat. 1991, ch. 40, par. 510(a)), as amended (Pub. Act 87—714, § 1, eff. January 1, 1992 (1991 Ill. Laws 3557)), now provides that retroactive modification of maintenance or support may be ordered no earlier than the date on which the nonmovant receives due notice of the filing of the petition. (*Hawking*, 240 Ill. App. 3d at 426, 608 N.E.2d at 331.) We conclude termination of maintenance may not be effected prior to the date a petitioner received notice a petition had been filed.

In addition, as facts showing the existence of the type of cohabitation which was intended by the legislature to terminate maintenance may be supported by events occurring after the date the petition is filed, we hold that a determination of the effective date of termination is a matter within the court's discretionary authority. This holding is in conformity with our opinion in *In re Marriage of Stanley* (1985), 133 Ill. App. 3d 963, 977, 479 N.E.2d 1152, 1162, wherein we held that maintenance payments were then terminable as of the date the petition was filed, provided "the allegations of the petition are sustained by proof of facts in existence as of the date of the petition's filing." In this instance, some of the events showing the continuing nature of the relationship may not have occurred until after receipt of notice the petition had been filed. Accordingly, it is necessary to remand this case to the circuit court with directions to enter an order terminating respondent's maintenance obligation and to determine the date the *de facto* husband and wife relationship was established.

•3 Respondent last argues the court erred in finding him in wilful contempt and in awarding attorney fees to petitioner. Respondent in essence argues the contempt finding was in error because he was entitled to a setoff for maintenance paid subsequent to petitioner's cohabitation with Longanecker against the property award granted in the dissolution. A similar argument relating to nonpayment of maintenance based on a presumed cohabitation was rejected by this court in *Lambdin* (245 Ill. App. 3d at 807-08, 613 N.E.2d at 1390), which found that proof of noncompliance with an order to pay maintenance constitutes *prima facie* evidence of contempt. A finding of

contempt will be reversed only if it is against the manifest weight of the evidence. (See *Lambdin*, 245 Ill. App. 3d at 808, 613 N.E.2d at 1390.) Our review of the record fully supports the court's entry of a finding of contempt for respondent's noncompliance with the August 1990 judgment of dissolution, awarding petitioner property and attorney fees in the sum of $54,695. That award had been affirmed on appeal to this court and was not subject to setoff based on events occurring post-dissolution. The court entered an order for rule to show cause related to nonpayment of the property award on November 27, 1991. As that award remained unsatisfied through the time of the ruling on respondent's post-trial motion, we do not find that the contempt order was against the manifest weight of the evidence. Accordingly, an award of attorney fees incurred in enforcing the property award was mandatory. See *Stanley*, 133 Ill. App. 3d at 974, 479 N.E.2d at 1159.

●4 The court ordered respondent to pay petitioner's legal fees in the sum of $10,433. The record does not indicate the portion of attorney fees which related to the contempt finding and the portion which related to defense of the petition to terminate maintenance. Respondent does not contest the reasonableness of the total amount of the fees incurred. While attorney fees relating to enforcement of the property award are mandatory pursuant to section 508(b) of the Act (Ill. Rev. Stat. 1991, ch. 40, par. 508(b)), the court had discretionary authority to award attorney fees relating to defense of the petition to terminate maintenance pursuant to section 508(a) of the Act (Ill. Rev. Stat. 1991, ch. 40, par. 508(a)). The evidence indicates petitioner had received no maintenance since May 1992 and her only source of income was social security benefits of $643 per month. In taking judicial notice of our order affirming the judgment of dissolution, we note that respondent retained nonmarital property then worth over $1,400,000 and had annual income in excess of $130,000. A trial court abuses its discretion in not awarding attorney fees under section 508(a) of the Act when the evidence reveals a great disparity in income and earning capacity, and the financial inability to pay of the spouse seeking relief. *In re Marriage of Gable* (1990), 205 Ill. App. 3d 696, 700, 563 N.E.2d 1215, 1217-18; *In re Marriage of Edsey* (1990), 199 Ill. App. 3d 39, 57, 556 N.E.2d 552, 563.) In this case the record is clear petitioner lacked the financial ability to pay the attorney fees incurred in defending the petition and respondent had considerable income and assets from which to do so. Under the circumstances, we hold the award of attorney fees to petitioner was not an abuse of discretion.

The order of the circuit court is affirmed in part, reversed in part, and remanded for further action consistent with this opinion.

Affirmed in part; reversed in part and cause remanded with directions.

KNECHT and GREEN, JJ., concur.

## SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

JUSTICE COOK delivered the opinion of the court:

●5 In *In re Marriage of Cotton* (1984), 103 Ill. 2d 346, 360-62, 469 N.E.2d 1077, 1084-85, the supreme court held that where a petitioner by her own misconduct makes post-decree proceedings necessary it is inequitable to require respondent to pay fees to petitioner's attorneys, even if respondent is well able to do so. Respondent, citing *Cotton*, asserts in his petition for rehearing that we should not have required him to pay petitioner's attorney fees. It should be understood, however, that maintenance was not here terminated on account of petitioner's immorality or misconduct, any more than it would have been if maintenance had been terminated because petitioner had remarried. Maintenance was terminated because of the existence of a statutory factor requiring termination. There was a substantial question whether that factor existed, and petitioner was entitled to representation in litigating that issue.

KNECHT and GREEN, JJ., concur.