*In re* MARRIAGE OF KATHERINE E. HERRIN, Petitioner-Appellant, and JOHN E. HERRIN, Respondent-Appellee.

Fourth District    No. 4—93—0692

Argued February 16, 1994.—Opinion filed May 20, 1994.

Almon A. Manson, Jr. (argued), and Denise M. Druhot, both of Brown, Hay & Stephens, of Springfield, for appellant.

Michael B. Metnick (argued) and Kathryn Saltmarsh, both of Metnick, Barewin, Wise & Cherry, of Springfield, for appellee.

JUSTICE STEIGMANN delivered the opinion of the court:

In May 1990, petitioner, Katherine E. Herrin, and respondent, John E. Herrin, were granted a dissolution of marriage, and a settlement agreement was incorporated into the judgment of dissolution. Under this agreement, petitioner was to receive $2,000 per month in maintenance payments, which would terminate if a court found that petitioner was cohabitating with another on a resident, continuing, conjugal basis. This portion of the agreement corresponds with section 510(c) of the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1989, ch. 40, par. 510(c)).

In June 1992, respondent filed a petition to terminate maintenance based on allegations that petitioner was cohabitating with Michael Badger on a resident, continuing, conjugal basis. After a hearing, the trial court granted the petition. Petitioner appeals the court's termination of maintenance and denial of her motion to reconsider and reopen the evidence. We affirm.

## I. BACKGROUND

Petitioner, respondent, and Badger testified at the October 1992 hearing concerning the alleged cohabitation of petitioner and Badger as follows. Badger and petitioner have been romantically involved for approximately $2^{1}/_{2}$ years and were engaged in a monogamous sexual

relationship. Badger testified that he did not have any intention of seeing other women, while petitioner was unsure whether she intended to see any other men romantically.

Badger and petitioner testified that they love each other and have discussed marriage. One of the reasons they have not married is that Badger would not be able to support petitioner at the standard of living to which she has become accustomed. Badger was aware that if they married, petitioner would no longer receive $24,000 a year in maintenance. Badger also knew that if he slept at petitioner's residence, her maintenance would end.

Badger has owned a residence for approximately four years, but it does not have gas service, heat, or hot water. Badger testified that he sleeps at this residence seven nights a week except on weekends when petitioner's children stay with respondent and he stays overnight with petitioner.

Badger eats most of his meals at petitioner's residence with petitioner and her children. Badger generally does not buy any groceries for these meals. Occasionally, he eats at his residence. After dinner at petitioner's residence, Badger makes phone calls for his real estate business, watches television, or plays with petitioner's children. Occasionally, Badger gives petitioner's phone number to his clients so they can reach him at her home.

Badger and petitioner spend most holidays and vacations together with their respective children, making these trips several times a year. In the 18 months before the October 1992 hearing, petitioner and Badger, accompanied by the children, traveled outside Springfield six times. These trips included vacations to Wisconsin and Missouri, visits to Badger's parents in Michigan, and visits to petitioner's father in Arkansas. Although petitioner and Badger usually shared the expenses for these trips, petitioner primarily paid for one week-long vacation.

Badger typically stays at petitioner's residence until around 10:30 p.m. each evening and then returns to his home, taking petitioner's car because he does not have a vehicle. He had made payments on a van, but under the terms of his divorce, he was forced to turn it over to his ex-wife. At one time, the loan payments had been made by Badger's employer. However, his employer determined that this was too expensive and stopped making the payments. At this point, petitioner took out a loan, paid for the van, and became a lien holder on the van. Since that time, Badger has occasionally not made the van payments to petitioner on time.

In October 1992, Badger kept a computer at petitioner's residence. Badger had tried to purchase this computer on credit, but his request was denied. Before the computer was repossessed, petitioner

signed a loan in her own name, incurring a debt of approximately $2,000 in order to keep the computer. The monthly payments on the computer are about $102. Although Badger usually made these payments, on occasion petitioner did. Neither Badger nor petitioner kept a record of who made which payments.

Badger has also had difficulties meeting his obligations for child support payments. On at least five occasions, petitioner loaned him the money to make these payments. Badger claims to have reimbursed petitioner for these amounts; however, he did not provide any documentation to support these claims.

After hearing the evidence, the trial court granted respondent's petition to terminate maintenance. In a memorandum opinion, the court found that Badger and petitioner were "living together in a [resident,] continuing conjugal relationship." The court specifically found that allowing Badger's evening sojourns to a home with no heat or hot water to defeat the legislative intent behind termination of maintenance upon cohabitation would "exalt form over substance."

In May 1993, petitioner filed a motion to reconsider and a motion to reopen the evidence. She argued that the trial court did not hear evidence regarding the financial position of the parties, and therefore did not—and could not—make a finding that the alleged cohabitation materially affected petitioner's need for support.

In July 1993, the trial court denied these motions, concluding that it was not required to make a specific finding that the cohabitation materially affected petitioner's need. The court ruled that such a finding is not prerequisite to terminating maintenance, but another factor for the court to consider in assessing the nature of the relationship between Badger and petitioner. The court also found that the evidence clearly showed that petitioner supported Badger and, to the extent of his limited resources, Badger reciprocated.

## II. ANALYSIS

### A. Termination of Maintenance

■ Maintenance will be terminated based upon resident, continuing, conjugal cohabitation if the ex-spouse paying the maintenance can show that a *de facto* husband-and-wife relationship exists. Once this is shown, the burden shifts to the recipient to demonstrate that he or she is not engaged in that type of relationship. (*In re Marriage of Sappington* (1985), 106 Ill. 2d 456, 467, 478 N.E.2d 376, 381.) A court of review will not reverse the trial court's finding concerning the existence of such a relationship unless that finding is contrary to the manifest weight of the evidence. *In re Marriage of Caradonna* (1990), 197 Ill. App. 3d 155, 159, 553 N.E.2d 1161, 1164; *In re Marriage of Lambdin* (1993), 245 Ill. App. 3d 797, 802, 613 N.E.2d 1381, 1386.

Petitioner argues that the evidence does not support a finding that a *de facto* husband-and-wife relationship existed. She contends that because the underlying rationale for maintenance is the need of the party receiving it, a husband-and-wife relationship does not exist if the cohabitation does not materially affect the recipient's need for support. In response, respondent focuses, as the trial court did, not only on the financial relationship between petitioner and Badger, but also on the other characteristics of the relationship. We agree with respondent.

The rationale behind termination of maintenance when resident, continuing, conjugal cohabitation exists is the inequity created when the ex-spouse receiving maintenance becomes involved in a husband-and-wife relationship but does not legally formalize it, with the result that he or she can continue to receive maintenance. (*Lambdin*, 245 Ill. App. 3d at 801, 613 N.E.2d at 1386.) On this record, we hold that the trial court's conclusion that petitioner and Badger had a continuing, conjugal relationship is not contrary to the manifest weight of the evidence. This holding leaves only the question of whether their relationship is also "resident" for purposes of section 510(c) of the Act—that is, did they cohabitate? The court found that Badger was a resident and cohabitant, notwithstanding the fact that he often slept in another residence.

■ Every case in which a termination of maintenance is sought presents a unique set of facts. (*Sappington*, 106 Ill. 2d at 466, 478 N.E.2d at 380.) In determining the nature of the relationship between petitioner and Badger and deciding whether that relationship could be distinguished from weekend visits or a merely "dating" relationship, the trial court appropriately considered various factors defining that relationship, such as (1) its length; (2) the amount of time petitioner and Badger spent together; (3) the nature of the activities they engaged in; (4) the interrelation of their personal affairs; (5) their vacationing together; and (6) their spending holidays together. The test the court should employ (and did in this case) is the totality of the circumstances.

■ In the present case, petitioner and Badger saw each other every day for over 2 1/2 years, spent most evenings together, engaged in sexual relations, took vacations and spent holidays together. Furthermore, Badger spent the night at petitioner's residence every other weekend (when the children stayed with respondent), ate most of his meals there, gave petitioner's phone number to his clients so they could reach him there, used her car as much as 90% of the time, and borrowed money from her to pay his child support. Petitioner also took out loans to pay for Badger's van and computer.

Petitioner and Badger had discussed marriage, but decided against it for financial reasons. Badger was aware that if they married, or if he continuously slept at petitioner's residence, she would no longer receive maintenance. Considering all of these circumstances, we conclude that sufficient evidence exists to support the trial court's granting of the petition. Accordingly, we hold that the court's decision is not against the manifest weight of the evidence.

Petitioner further contends that there was no showing of a *de facto* husband-and-wife relationship because the evidence failed to demonstrate that the relationship materially affected her need for support. In other words, petitioner claims that whatever her relationship with Badger might be, it did not reduce her need for the support that respondent's maintenance payments provide her. Petitioner relies on *Sappington* for the proposition that in order to find cohabitation resulting in a termination of maintenance, there must be a finding of a material effect on the recipient's need for support. *Sappington* in turn cites *In re Marriage of Bramson* (1980), 83 Ill. App. 3d 657, 663, 404 N.E.2d 469, 473, which states the following:

> "Moreover, the legislative intent [of section 510(c) of the Act] does not appear to be an attempt to control public morals. [Citation.] Rather, an important consideration, divorced from the morality of conduct, is whether the cohabitation has materially affected the recipient spouse's need for support because she either received support from her co-resident or used maintenance monies to support him."

This approach has been used in several appellate opinions. See *In re Marriage of Arvin* (1989), 184 Ill. App. 3d 644, 649, 540 N.E.2d 919, 923; *Caradonna*, 197 Ill. App. 3d at 159, 553 N.E.2d at 1164; *In re Marriage of Johnson* (1991), 215 Ill. App. 3d 174, 180, 574 N.E.2d 855, 858; *In re Marriage of Klein* (1992), 231 Ill. App. 3d 901, 906, 596 N.E.2d 1214, 1217; *In re Marriage of Reeder* (1986), 145 Ill. App. 3d 1013, 1018, 495 N.E.2d 1383, 1386.

In *In re Marriage of Frasco* (1994), 265 Ill. App. 3d 171, this court found that a demonstrated need for support cannot be controlling and in itself does not defeat a petition to terminate maintenance when, as in this case, all other factors demonstrate a resident, continuing, conjugal relationship exists. We reaffirm this court's holding in *Frasco* and its underlying analysis. While the trial court can consider the financial interaction between the interested parties, that factor is not controlling; if the court finds the required relationship exists based on its assessment of the totality of the circumstances—as the court did here—it need not make any specific finding as to the maintenance recipient's financial need.

## B. Denial of Petitioner's Motion To Reopen the Evidence

■ Last, petitioner argues that the trial court improperly denied her motion to reopen the evidence. Petitioner contends that because the evidence before the court did not reflect petitioner's, respondent's, or Badger's financial condition, the evidence necessarily does not support a finding that the relationship materially affected petitioner's need for support. Petitioner claims such a finding is required by *Sappington.*

In this case, the trial court ruled that the financial status of the parties did not require a separate analysis. For the reasons stated earlier, we agree. *Sappington* stands only for the proposition that the effect of the relationship on the financial need of the recipient party constitutes a factor for the court to consider in determining whether the required relationship exists.

Petitioner made her motion pursuant to section 2—1203 of the Code of Civil Procedure (Code) (Ill. Rev. Stat. 1991, ch. 110, par. 2—1203). The granting or denying of such motions lies within the discretion of the trial court. *In re Marriage of Hopkins* (1982), 106 Ill. App. 3d 135, 137, 435 N.E.2d 897, 899.

By her motion, petitioner attempted to introduce evidence concerning her monthly expenditures ($8,276), her annual earnings ($7,898), and respondent's annual salary ($715,438). The evidence petitioner offered in her motion addressed the effect on her if maintenance is terminated, not the effect of her relationship with Badger on her need, which is the factor discussed in *Sappington.* Therefore, this evidence was properly refused.

Furthermore, as stated above, any evidence relating to the relationship's effect on petitioner's need, while a factor that may be considered, is not controlling. The trial court found the other necessary factors present, and we have no reason to believe that this additional evidence would suffice to defeat the petition. (*Frasco,* 265 Ill. App. 3d at 176-77.) We hold that the trial court did not abuse its discretion by denying petitioner's motion.

## III. CONCLUSION

For the reasons stated, we affirm the circuit court's termination of petitioner's maintenance.

Affirmed.

KNECHT and COOK, JJ., concur.